IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. 1:12CR238-DDD-2 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DOWD |
| v. | ) | |
| | ) | |
| DOUGLAS WRIGHT, et al. | ) | **DEFENDANT BRANDON BAXTER'S** |
| | ) | **SENTENCING MEMORANDUM** |
| | ) | **REGARDING OBJECTIONS** |
| | ) | **TO THE PSR AND THE GUIDELINES** |
| | ) | **CALCULATIONS** |
| Defendants. | ) | |

This sentencing memorandum is submitted on behalf of Brandon Baxter in order to supplement the information and arguments in the defendants' joint memoranda regarding the facts of the case, the "case law" basis for the adjusted offense level and reasons why the CHS's unrecorded statements deserve no credence.

**Memorandum**

**I.     Introduction**

This memorandum focuses on the contextual and factual inaccuracies and omissions in the PSR which, if corrected, would demonstrate that the terrorism enhancement should not be applied.[1]  It was, admittedly, a daunting task for the probation officers to summarize the offense conduct in few paragraphs.   However, the Court cannot fairly access the objections to the PSR and the "heartland" issue without more specific information about the context in which various

---

[1] Out of necessity there is some overlap between the facts which relate to the objections to the PSR involving the argument that the terrorism enhancement should not apply because this case is outside of the "heartland" of   terrorism cases and the facts which relate to the application of the "3553 factors".

1

events and conversations occurred.[2]

This memorandum gives particular attention to the manner in which PSR portrays the conversations which occurred on March 28, 2012 (Paragraphs 15, 22, 26 and 37). In these paragraphs the PSR seizes upon selected responses that Mr. Baxter made in the conversations of March 28th . The PSR wrongly concludes that a plan to blow up a bridge was hatched on that day for the purpose of influencing the Government.   This conclusion was used as the basis for the finding that the terrorism enhancement should be applied.   (See paragraph 37).

In this memorandum counsel will demonstrate that the PSR's account of what was said on March 28th is contextually inaccurate and should be disregarded because the conversations of March 28th are unrelated to the events which led to the acquisition of the C-4, the discussions concerning the use of the C-4 and the CHS's selection of location at which the C-4 would be used.

**II.    The PSR**

    **A.    Paragraphs 7-14 of the offense conduct section of the PRS**

Counsel has no quarrel with paragraphs 7-14 of the statement of the offense conduct which summarizes the relevant events through February 20, 2012.   These paragraphs fairly reflect that the defendants wanted to acquire protective riot gear for the Chicago protest when the CHS began to enmesh himself into their lives and that he was able to initiate and continue his contacts with the defendants by providing them with meals and money.

    **B.    The PSR fails to include important information about the events which transpired between February 20, 2012 and March 28, 2012.**

There are material omissions regarding the events which transpired between February 20, 2012 and March 28, 2012. The first recorded conversations between the defendants and the CHS

---

[2] A calendar is hereto attached which reflects the dates upon which the various events occurred.

occurred on February 24, 2012 when the CHS took the defendants out to dinner.[3] There was no mention of C-4 during their conversations. On March 2, 2012, the CHS drove the defendant to a protest meeting in Cleveland. In the recorded conversations of that day there was no mention of C-4. Between approximately March 10th and March 20th defendants Wright and Baxter went to Chicago (Wright) and St. Louis (Baxter) to attend "Occupy" related events. During this period the CHS lost contact with the two men.

The CHS realized that further seduction was required in order for him to put himself in a position where he could prod them into getting the C-4. When Mr. Wright returned from Chicago, the CHS offered him a job at one of his rental properties in order to have a receptive, and captive, audience for his prodding about the C-4.   Mr. Wright gladly accepted the offer and began working for the CHS on March 22, 2012.

While Mr. Wright was working for the CHS on March 22nd, the CHS initiated discussions about obtaining the protective riot gear from his "source." The CHS also initiated discussions about acquiring explosives. Mr. Wright declined the invitation to acquire explosives and expressly told the CHS that: "We don't want anything lethal though." (Page 26, 1D4).   A similar scenario occurred on March 23, 2012.

The discussions of March 22nd and March 23rd led to an agreement between the two men that Brandon Baxter would be offered a job to work on the CHS's rental properties and that he would begin working on March 28th when the three men would meet with an "arms dealer" to inspect the riot gear. Brandon Baxter accepts the job offer.

---

[3] It should be noted that the CHS drove the defendants to all of the meals they had together, to the job sites during the period that the defendants were working for him, to the various locations where the defendants met with the "arms dealer", and, ultimately, to the bridge.   The CHS' transportation was a crucial ingredient to what transpired in this case.

  C.  **The events of March 28, 2012 as they relate to paragraphs 15, 22, 26 and 37.**

Paragraph 15 purports to summarize the events of March 28th. The summary contained therein is factually and contextually inaccurate. The summary fails to acknowledge that there were two separate and distinct events which occurred on March 28th. The first event was the conversations that took place while the CHS was driving Mr. Wright and Mr. Baxter to the job site. The second event was what happened when the men met with the "arms dealer" that day.

The second major problem with Paragraph 15 is that it unfairly summarizes what was said during the drive to the job site on March 28th. This summary was incorporated into Paragraphs 22, 26 and 37. Accordingly "the drive to the job site" discussion will be analyzed as it relates to all four paragraphs.

**The conversations which occurred during the drive to the job site on March 28th:**

On March 28th the CHS was driving the defendants to a job site via Rt. I-480. When Mr. Baxter was talking about the G8 protest in Chicago, he said:

Baxter:  Um…I've got some people…that…that are gonna be coming here from Saint Louis. A lot of them are gonna stop here in Cleveland and then go…go immediately to Chicago. And that seems like the …ah…the plan for a lot of people. So… I could probably figure that out at (ui) um-
Wright:  (ui)
Baxter:  A lot of people are coming from Chicago to here and then going back to Chicago.

The CHS jumps into the conversation about the protest and talks for about two and half minutes. He starts talking about setting up an email system to communicate with these people but ends by talking about a bridge. The conversation is tape recorded, but 80% of what he says is inaudible. The following is what is reflected in the transcript of the recording:

CHS:  Cause once you set up your email (ui) set up on the website (ui) like (ui) just figure it out. And when …(ui) have more of a (ui) like… first of all we don't have nothing like (ui) gotta figure that out (ui) and

4

```
****************************************************************
****************************************************************
*****************************************************************
****************************************************************
                 *****************
```
**[The Tape Recording is inaudible for about 90 seconds]**
```
         ***************************************
****************************************************************
****************************************************************
*****************************************************************
****************************************************************
****************************************************************
****************************************************************
*****************************************************************
```

    (UI) **LIKE A (UI) BRIDGE**…

(page 20 of 1D6)

    The CHS' reference to a bridge was the first reference that anyone made to a bridge in a tape recorded conversation.[4] After the CHS refers to a "bridge", Mr. Baxter responds by saying:

    Baxter:      How much do you think we need to take out a bridge?
(page 20 of 1D6)

    The CHS immediately starts to steer the conversation to explosives and bridges.  He wants to get off at the next exit and check out the base of the bridge.  He does not stop, but he keeps the conversation focused on explosives and bridges. Later on in the conversations the CHS says:

    CHS:      What are you talkin' about (ui) like C-four blocks?[5]
(page 22, 1D6).

    The CHS's reference to the C-4 was the first reference to C-4 that we hear anyone make in any of the recorded conversations.  The discussion continues and Mr. Baxter says:

---

[4] A "global" computer search for the word "bridge" in the transcripts of the recorded conversations which were prepared by the Government discloses that this was the first reference to the word "bridge" in any of the transcripts of the recorded conversations.

[5] The Prosecutors contend that the CHS said "like three or four blocks" however after having listened to the tapes defense counsel believes that the CHS did in fact say "like C-4 blocks".  A global search for the word "C-4" in the transcripts reveals that this was the first reference to C-4.

> Baxter: **You know that… that if we.. That this… if this is some… this happens they're gonna make security on almost every bridge in the entire fuckin' country.**

(page 28, 1D6) [This is the segment in the transcript which is quoted in PSR paragraphs 15, 22, 26 and 37 and serves as the basis for the finding that the terrorism enhancement should be applied as is reflected in paragraph 37].

The discussion continues until the three men reach the job site where they met the "arms dealer" and inspect the riot gear. Absolutely nothing was decided about acquiring C-4, let alone about using the C-4 to damage a bridge, on March 28th. The whole discussion about bridges on March 28th was just idle conversation that was initiated by the CHS in order to bait the defendants into talking about the possibility of using explosives.

The conversations of March 28th are unrelated to the events that followed after April 1st when the CHS succeeded in prodding the defendants into accepting the C-4. Once the C-4 was accepted, the CHS had to prod the defendants into talking about what, if any use, they would make of the C-4 until April 19, 2012 when he, the CHS, ultimately selected the Route 82 Bridge as the location where they would use the C-4. The conclusion that the conversations of March 28th were unrelated to future events is borne out by the fact that when the "arms dealer" offered the defendants the C-4 on March 28th, they declined the offer. Moreover, in discussions which occurred two weeks later when the CHS was prodding the defendants into talking more about a bridge as a target and the following exchange occurred:

> CHS: Right, but, I mean I mean… my whole thing was, like, we was talking about… from day one, we, you said, let's do the bridge. So I'm like…
> B**axter:** **No, I never said, like, do the bridge.**
> CHS: Okay, well dude, that's …
> Baxter: I was throwing out options. Everybody, we were having discussions (ui).
> Wright: But we never further discussed that, either.
> Stevens: We, we never actually decided on doing any, anything. And we were just

throwing out options.

(Page 8, 1D12, April 10, 2012).

When viewed in context, it is clear that on March 28th Brandon Baxter was only responding to the CHS's reference to a bridge and to the CHS's continued prodding to talk about damaging a bridge.   Mr. Baxter did not hatch a plan to damage a bridge or otherwise express an intention to influence the Government.

Nonetheless, Paragraph 22, which purports to summarize Mr. Baxter's involvement in the case, includes the allegation that. Baxter was the first person to the mention blowing up a bridge

Paragraph 26, the victim impact statement, begins by saying that "the government was the intended victim" because the defendant selected the Northfield –Brecksville Bridge and, according to the PSR. "by selecting the target, the defendants indicated that the government would to put security on basically every bridge" (this refers to the comments of March 28th). Again, when viewed in context, this conclusion is unfounded.

Paragraph 37 sets forth the reasons why the Probation Office believes that the terrorism enhance should be applied and reads in pertinent part as follows:

> … In this case, the defendants identified potential targets that if carried out would have intimidated or retaliated against the government under the Occupy Movement banner.  **The group had talked about how taking out a bridge would have forced the government to put security on basically every bridge**.   This demonstrates how the group was attempting to intimidate the government.   The group also discussed blowing up the Turning Bridge, a train, an armored car, the Fusion center and lastly, the Justice Center.

Once again there is a reference to the comment that Mr. Baxter's made about security for the bridge (as quoted above) on March 28th .   And, again, it should be clear that on March 28th, there was not plan to acquire C-4, no plan to use C-4 and no plan to "target" a bridge, or any other structure, for any purpose.

**Paragraph 15 -The meeting with "arms dealer on March 28th**

The second distinct event which occurred on March 28th was the meeting at the job site with the "arms dealer" who showed the three men samples of riot gear. At this meeting Mr. Wright and Mr. Baxter expressed interest in acquiring the gear (even though they had no money to pay for it). However, when the "arms dealer" showed them pictures of C-4, they declined the offer to acquire it.

On March 30th, the "arms dealer" called Mr. Wright and offered him the C-4 again and, again, Mr. Wright declined the offer.

**Paragraph 16**

Paragraph 16 accurately reflects the facts that the defendant had repeatedly declined the CHS's offers to acquire the C-4 until April 1, 2012. However, the PSR omits the crucial information about the circumstances under which the defendants were prodded into agreeing to accept the C-4.

By March 31st it was clear that the CHS was frustrated by the defendants' unwillingness to make any commitment to acquire the C-4. His prodding became much more aggressive. On March 31, 2012, the CHS was driving Mr. Wright and Mr. Baxter to work and said:

> **"I think we should get it.** What's your take on this? **Because my thing is this.** Even if we buy just two, he said that he could get us a stick of it for like, what did he say? 100 bucks. I know that they, he get them sticks, he got 4 of em', and I know that he ain't goin' to take em' back because it is hard to get rid of them joints, so I could probably get him to come down on the price on them especially, I'm gonna call and he like look, my dude went online and looked at those, um, batons or whatever, we can get em' for X amount of price, you give us the sticks of C-4 at 50 dollars apiece like that and we'll go ahead and grab, uh, all of them, and then we can put them at the house on Harvard or something."

(See pages 4-7, 1D10-1).

Mr. Baxter listens to the sales pitch and eventually says "it's your money." (Page 8 of

8

1D10-1). The following day Mr. Wright met with the arms dealer and agreed to accept the C-4.

However, there was no plan to use the C-4 at any location. Mr. Wright and Mr. Baxter had simply acquiesced to the CHS' prodding to accept the C-4.

**Paragraphs 17 and 18**

Paragraphs 17-18 fail to accurately inform the Court about circumstances surrounding the discussions about whether defendants wanted to use the C-4, and if so, where they would use it.

As of April 7th, there was no plan to use the C-4. The CHS has arraigned for the three defendants to work for him that day so that he would have a captive, and receptive, audience for his prodding about using the C-4. The CHS got right to the point and the following exchange occurred:

> CHS: Ok so, we need to A, figure out what we are doin' I mean are, are, did you figure out, are you definitely wanting to go with the Detroit Bridge er, or, are we gong to re-con that, I mean what, what's the plan cuz we ain't that far out from dis stuff.
>
> Baxter: Um, I was just throwin' around ideas with that stuff. Um, I, I, I don't know exactly what we, what we should do with that. Um. Uh uh, I'm really thinkin' that take out a bridge, the , I , I, I, don't know exactly how the general public would take that. I don't know how, how, the , the media would not, would not, definitely not portray that in a good way. Um, I, I'm I don't know. I don't know . Um.
>
> CHS: So what are we goin' to do with the shipment, cuz we got, I mean, we are on the hook for it.

(See pages 10-11, Transcript 1D11).

The defendants' joint statement of facts thoroughly reviews the lengthy discussions about possible sites which occurred on April 7th and thereafter. For the purposes of this memorandum is sufficient to say that the defendants responded to the CHS' prodding because he was the man who paying them $50 dollars a day to listen to him while they did light labor. Many sites were talked

about on April 7th, 10th and 12th, but nothing was decided.

Brandon Baxter stopped working for the CHS on April 13, 2012 because he got another job and did not participate in further discussions about if and where the C-4 should be used. As of the time he left the CHS' employment the discussions about a "site" focused on Mr. Wright's bizarre notion of dropping the C-4 off of a bridge to damage a cargo ship.

**Paragraph 19**

Paragraph 19 completely fails to address the question of how the location for the use of the C-4 was selected and ignores the fact that the CHS was the person who ultimately selected the location. (See Transcript 1D15.2, pp. 16-18).

As of April 19th, nothing had been decided about a site at which the C-4 would be used. Mr. Wright continued to respond to the CHS' prodding with his idea of dropping the C-4 into the river in order to damage a cargo ship. The CHS was frustrated by all of the talk about dropping the C-4 off of a bridge. On April 19, 2012, the CHS told Mr. Wright that they needed a "contingency" plan and that the contingency plan was to plant the C-4 at the base of the Route 82 Bridge. (See Transcript 1D15.2, pp. 16-18).[6]

It was only after the CHS proposed that the Route 82 Bridge site that Mr. Wright and the CHS drew Mr. Baxter back into the group.[7] Mr. Hayne and Mr. Stafford also became involved after the CHS selected the site.

**Paragraph 22**

Paragraph 22 purports to summarize Mr. Baxter's offense conduct. It first indicates that

---

[6] See also pages 24 through 29 of the Defendants' Joint Statement of the Facts.
[7] Although the Government contends that the defendants ultimately paid for the riot gear, defendant Baxter vigorously denies that he contributed anything toward the purchase of the riot gear and the C-4. He has previously filed a motion for DNA testing on the "buy money" and will take a polygraph test if necessary to prove that he did not pay for the C-4 and that, to his belief, none of the other defendants paid for the C-4.

10

Mr. Baxter was "the second person to join the plot after Wright brought the CHS into the group." This is not a fair statement of what happened because there was no plot to do anything other than to acquire riot gear until the CHS started his prodding.

Second, this paragraph alleges that "Baxter was the first person to mention blowing up a bridge." The previous discussion about the events of March 28th addresses this allegation.

Next, Paragraph 22 alleges that "Baxter helped select targets and developed plans to carry out the attack. While it is true that Mr. Baxter was present on April 7th, 10th and 12th when the CHS lead discussions about a target site and that, in order to placate the CHS, he talked about various sites, when he stopped working for the CHS on April 13th there was no plan to bomb anything. Mr. Baxter only reconnected with the group after the CHS had selected the site and the planning had begun.

Moreover, Paragraph 22 specifically alleges that: "he (Baxter) offered to use Occupy Wall Street protests on May Day as a distraction to attempts to blow up shipping traffic in the Cuyahoga River." This is not true. The only reference in the transcripts to the events at the river being a "distraction" is in the transcript of the April 10 discussion (1D12 pages 32-34) in which the CHS is talking about Brandon being a "decoy." Brandon then talks about **the events at the river being a distraction for the protest that he was going to be leading at the Cleveland City Hall.** In any event, the bizarre plan to drop the C-4 off of a bridge was rejected by the CHS and the plan was never carried out.

 **Paragraph 26 – The victim impact statement**

Mr. Baxter's objections to Paragraph 26 were made in connection with the previous analysis concerning what was actually said on March 28th

**Paragraph 37 – The purported reasons for applying the terrorism enhancement**

Mr. Baxter's objections to Paragraph 37 were also made in connection with the previous analysis concerning what was actually said on March 28th.

**Conclusion**

For the reasons set forth herein, counsel respectfully moves the Court to correct the PSR in the manner described herein and to refrain from applying the terrorism enhancement in this case.
.

                                                        Respectfully submitted,

                                                         /s/   John S. Pyle
                                                        JOHN S. PYLE (0001129)
                                                        **GOLD AND PYLE, L.P.A.**
                                                        jpyle@gp-lpa.com
                                                        1140 Leader Building
                                                        526 Superior Avenue, East
                                                        Cleveland, Ohio 44114
                                                        (216) 696-6122

                                                        Counsel for Defendant

                                              CERTIFICATE OF SERVICE

A copy of the foregoing was served electronically to all parties on the 1st day of November, 2012

                                                 /s/ John S. Pyle
                                                JOHN S. PYLE