IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:12CR238 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | GOVERNMENT'S |
| | ) | MEMORANDUM OF LAW AND |
| DOUGLAS L. WRIGHT, | ) | OBJECTIONS TO THE FINAL |
| BRANDON L. BAXTER, and | ) | PRESENTENCE REPORTS |
| CONNOR C. STEVENS, | ) | |
| | ) | |
| Defendants. | ) | |

Now comes the United States of America, by and through counsel, Steven M. Dettelbach, United States Attorney, and Assistant U.S. Attorneys Duncan T. Brown and Justin E. Herdman, respectfully submits its objections to the final presentence reports and position in support of the application of the terrorism enhancement.

## I.     Offense Level Calculations

### A.     Base Offense Level

The Government continues to assert that the proposed Base Offense Level is incorrect and under represents the actual offense conduct.  The defendants pled guilty in Court to using weapons of mass destruction, this language tracked the language used in the Indictment, which, in turn, applied the statutory language of  18 U.S.C. §2332a.  The definition of "Weapons of Mass Destruction" is provided in 18 U.S.C. §2332a(c)(2)(A) and clearly and unequivocally includes the Improvised Explosive Devices used in the instant case.  Moreover,  Guideline §2M6.1 addresses crimes using WMDs, a term of art specifically defined in statute and the Sentencing Guidelines; in contrast, §2K1.4 merely addresses crimes where destruction of property is sought with no definition or distinction as to the device used.

2

Because the devices were defined in the Indictment as "Weapons of Mass Destruction," the definition provided in 18 U.S.C. §2332a(c)(2)(A) controls.  That definition includes "destructive devices" as defined in 18 U.S.C.§921, which is identical to the definition used in 26 U.S.C. §5845(f) and the same definition for "destructive devices" adopted by the Sentencing Guidelines.  U.S.S.G. §1B1, Application Note 1.F, defines "destructive device" consistent with its usage in the Indictment; thus, §2M6.1 is the proper Guideline to use for Counts 1 and 2 because it is a more precise, consistent, and comprehensive definition of the offense conduct than the mere "explosives" term used in §2K1.4.

Applying §2M6.1, the Government asserts that, based on the facts discussed above, (a)(1) is the most appropriate base offense level.  §2M6.1(a)(1) assigns a level 42 for an offense involving the [A] intent to injure the United States.  In this case, the defendants, themselves, called their conduct the "greatest act of terrorism in Cleveland since the 60's."  Throughout their planning, they discussed multiple targets, and each target discussed was property of the government or used by the government.  As explained by WRIGHT, BAXTER, and STEVENS, this particular bridge was selected with the intent  to "interfere with commerce and send a message to the government."  As discussed above, consistent in the ongoing conversations between WRIGHT, BAXTER, and STEVENS was their desire to use the IEDs in a manner to send a message to the government; the specific selection of a bridge involved in interstate commerce accomplished that stated goal.

In the alternative, §2M6.1(a)(2), which establishes the base offense level at 28, would be the next most appropriate base offense level for Counts One and Two.  Because §2M6.1 envisages punishment for crimes involving Weapons of Mass Destruction, as these destructive

devices are statutorily defined, it would not be unreasonable to remain within this section for consideration of these counts.

However, the Government argues in the alternative, that if the Court adopts the Pre-trial Services recommendation of using §2K1.4, the Court should apply subsection (c)'s Cross-reference to Chapter Two, Part A, because the detonation of the two IED's would have caused death or serious bodily injury, and the defendants' actions clearly demonstrated their intent to detonate both devices, bring down the bridge, as well do so without trying to mitigate loss of life or injury, and in the hopes of starting a "civil war" in conjunction with anarchist activities in Chicago.  Applying the appropriate cross-reference, Sentencing Guideline §2A2.1(a)(1), Attempted Murder.  The Base Offense Level would be **33** because, if successful, the object of the offense - demolition of the Route 82 Bridge - would have constituted First Degree Murder - the pre-planned and pre-meditated unlawful killing of another person with malice aforethought. That the defendants' did not specifically identify their victims is inapposite, the controlling consideration is that they planned the bombing, took no steps to ensure the safety of others, and acted with the intent to start a civil war that would lead to the overthrow of the government.

Therefore, the Government argues that a Base Offense Level of 24 is inaccurate and fails to reflect the seriousness of the defendants' actions.  The alternatives provided in §2M6.1(a)(1) - Base Offense Level of 42, §2M6.1(a)(2) - Base Offense Level of 28, or through the application of the cross-reference in §2K1.4 of §2A2.1(a)(1) **-** Base Offense Level of 33, more accurately reflect the offense conduct.

**B.** **Role in the Offense**

As an even cursory review of the documents submitted by the Government shows, there are different levels of participation by each Defendant.  The Government concedes that Defendants Hayne and Stafford were late arrivals to the conspiracy and, as such, should not suffer increased penalties for their roles.  However, Defendants WRIGHT, BAXTER and STEVENS were participants from the early stages, and each took a material role in bringing the conspiracy to completion.  Moreover, based on defense arguments to date, the Government asserts any attempts to mitigate role based on an argument that the CHS's involvement amounted to entrapment is not only contrary to their pleas in Court, but also irrelevant.[1]

## 1. Douglas Wright

The Government submits that WRIGHT should be assessed an additional four (4) levels pursuant to U.S.S.G. §3B1.1(a) for being the organizer and leader of the criminal activity with five or more participants.  The five participants are WRIGHT, BAXTER, STEVENS, STAFFORD, and HAYNE.  Throughout the recordings, WRIGHT takes charge of the group.  He also openly recruited HAYNE, STAFFORD, as well as several other individuals who eventually dropped out.  WRIGHT conducted research into bridges and selected the final target; he and STEVENS also reconnoitered the selected location.  At all times, WRIGHT was an eager and active member and leader of the group.

Additionally, WRIGHT has a long history of arrests and convictions for violent behavior and spoke openly and often of his desire that the bombing would be used by other anarchist

---

[1]The defense of entrapment is an affirmative defense at trial.  Any theory of "vicarious" or "indirect" entrapment has been expressly and repeatedly rejected by the Sixth Circuit as viable at sentencing.  United States v. Mendez-Ortiz, 810 F.2d 76 (6th Cir. 1986); United States v. McLernon, 746 F.2d 1098 (6th Cir. 1984); United States v. Lee, 694 F.2d 649 (6th Cir. 1983).

groups to start a "civil war" that would lead to the overthrow of the government.  From the initial meetings with the CHS, WRIGHT had a plan that was detailed, specific, and had an intended message animating it; this was not a mere "prank" in his mind, this was a message to the world and the first step in a violent anarchist ideology.  He recruited every member of the group personally and made sure each was committed to the same end goal he was.

### 2.  Brandon Baxter

The Government argues that BAXTER should be assessed an additional three (3) levels pursuant to U.S.S.G. §3B1.1(b) for being a manager, but not leader, of the criminal activity with five or more participants.  BAXTER spearheaded many discussions of targets, and in fact, kept the group focused on governmental targets and targets that carried political significance and meaning.  BAXTER was the first person to suggest a bridge as the target and was also the first to offer to serve as a decoy during protests to confuse and obstruct law enforcement's response to any explosions.  BAXTER was present at the initial meeting with the undercover agent to discuss purchasing explosives and tactical gear, and also at the actual purchase and delivery of the IEDs.

Although Pre-trial Services declined to give him an enhanced role, such an increase is appropriate and warranted.   U.S.S.G. §3B1.1 provides for an increase if the behavior was consistent with action in the past; BAXTER assaulted his step-father with a knife, has an open case for Carrying a Concealed Weapon, and admitted to being a Neo-Nazi.  His behavior in this case is consistent with the violent and politically motivated actions of his past - it is important to consider that this crime of violence has a political motivation behind it and that BAXTER has similarly self-identified himself with violent, racist groups as well.

### 3.  Connor Stevens

The Government contends that STEVENS should be assessed an additional two (2) levels pursuant to U.S.S.G. §3B1.1(c) for being an active participant and organizer of the criminal activity with five or more participants.  STEVENS was present at multiple meetings between February and the time of arrest, and was an active participant in the strategy and planning sessions.  STEVENS offered ideas for governmental targets and also added assistance in the reconnoitering of the selected target.  At no time did STEVENS try to stop the conspiracy and, in fact, was eager to introduce a structural engineer into the group for the next anticipated in order to assure maximum damage.  STEVENS was noticeably excited the night of the bombing, and indicated he was glad he participated in, and took pride in being part of, what he believed to be "greatest act of terrorism in Cleveland since the 60's."

As with BAXTER, STEVENS has a history of politically motivated crime.  While a high school student he organized a protest of the United States Army that included emailing threats of violence against Army recruiters, an email encouraging people to "KILL COPS!  YEA, THE PIGS IN BLUE ARE THE FASCISTS WE HAVE TO FIGHT!!!!  LET'S FUCK 'EM UP, LET'S ORGANIZE!!!  Kill a cop!  In struggle, Connor C. Stevens," and an attempt to form a group called the "United Student Front" to further those goals.  Quite simply, STEVENS' behavior and actions during this conspiracy were lock-step in line with his prior actions. Moreover, his prior actions demonstrate that he was in agreement with the political aims that this attempted bombing was done to further.

## C.  **Acceptance of Responsibility**

The Government objects to the awarding of any points for acceptance of responsibility for any of the defendants.

The Government also asserts that the post-plea declarations of each defendant disavowing any intention to harm people are directly contradictory to their recorded statements and their direct actions on the night of, and leading up to, April 30, 2012, and therefore even two levels should not be awarded.

Most importantly, Acceptance of Responsibility should not be awarded because the defense is continuing to argue entrapment despite the defendants' pleas of guilt.  The affirmative defense of entrapment is not available because they pled guilty; moreover, the defense does not expand to the theory of "vicarious" or "indirect" entrapment, which has been expressly and repeatedly rejected by the Sixth Circuit as a viable theory of defense or at sentencing.  United States v. Mendez-Ortiz, 810 F.2d 76 (6th Cir. 1986); United States v. McLernon, 746 F.2d 1098 (6th Cir. 1984); United States v. Lee, 694 F.2d 649 (6th Cir. 1983).

It is anticipated that the defense will go to great lengths to attack the personal history of the CHS, drawing attention to the CHS' criminal history, his financial history, and perhaps even make attacks on his personal life.  These attacks are not only completely irrelevant and petty, but are completely at odds with the facts of the case.   By attempting to blame the CHS for being a bad person or a convicted felon, and therefore, guilty of corrupting the defendants, counsel is merely eroding any legitimacy of their clients' admissions of guilt to Pre-trial Services.

On October 21, 2011, as established in documents provided to the defense, the CHS was tasked to observe for any violence during a protest.  During that observation he met WRIGHT, who neither the CHS nor the FBI knew previously.  Through subsequent conversations, WRIGHT provided to the CHS a plan to destroy bank signs and ignite incendiary devices on local bridges.  WRIGHT also began to introduce the CHS to other people WRIGHT believed to share his violent anarchist ideology.  As is evident in the recordings, at no time did the CHS ask

for more members to be added, ask for specific people to join, or introduce anyone to the group -
the group was formed, controlled and organized by WRIGHT.

The plans to destroy bank signs was initiated by WRIGHT. Likewise, WRIGHT
indicated a desire to build or buy "plastic explosives." In the interests of public safety, the CHS
offered to put WRIGHT and BAXTER in touch with someone who could sell them C-4, a plastic
explosive, so that neither WRIGHT nor BAXTER would injure themselves or others while trying
to make bombs. As is evident in the recordings, at no time did the CHS encourage a politically
motivated use for the C-4 independent from the conversations started by WRIGHT, BAXTER,
or STEVENS, nor did the CHS engage in initiating conversations about target selection or plan
development. It must be noted that when WRIGHT, BAXTER, and STEVENS assigned
themselves roles in various plans, the CHS was usually given the task of "driver," "look out," or
another menial role; conversely, in several plans WRIGHT and STEVENS were to place and
detonate charges in the river, and BAXTER was to lead a distraction that would devolve into a
riot. Likewise, the political objectives of the CHS were never asked about by the defendants,
however they spoke at length about their violent anarchist goals.

Finally, by merely attacking the CHS and shifting the blame to the CHS, the defendants
fail to explain their actions adequately. To credit them that the CHS created the entire situation
is to have to believe that they were wholly incapable of acting by themselves. This simply is not
true. The defendants all were not only committed to anarchy, they were advanced enough in
their beliefs that they sought out opportunities to best satisfy those beliefs. All were
disenchanted with the Occupy movement and wanted to do more violent and high-profile
protests, they sought out others who had moved from the Occupy group, and even Occupy itself
distanced the organization from them. All of the defendants have past contact with law

enforcement for violent and threatening acts, and all of those acts were propelled by their political beliefs. All of the defendants knew of the plan, participated in its formulation, and were present the night of the bombing. If anything, the fact that the CHS played any role whatsoever must be credited with the fact the defendants used the CHS for rides around town, access to the internet, and occasional employment.[2] Simply put, the CHS was merely a means to an end for the defendants in their goal to carry out an attack that would, in their minds, lead to a larger civil war.

## II. Application of the Terrorism Enhancement

### A. U.S.S.G. § 3A1.4 - Terrorism Enhancement

Part A of Chapter Three of the U.S.S.G. provides for "Victim-Related" adjustments to the Guidelines offense level. Following Congressional passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132 (1996), the current version of U.S.S.G. § 3A1.4 provides:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense is less than level 32, increase to level 32.

> (b) *In each such case*, the defendant's criminal history category . . . *shall be Category VI.* (Emphasis added).

The Application Notes to Section 3A1.4 were amended to their current form after enactment of the USA PATRIOT Act in 2001. The current version of U.S.S.G. § 3A1.4 consists

---

[2]WRIGHT and STEVENS worked with a roofing contractor during this time, BAXTER had outside employment, and the work provided by the CHS was not permanent.

of four Application Notes which are viewed as "part of the Guidelines themselves and not mere

commentary on them."  Stinson v. United States, 508 U.S. 36, 38 (1993).

Viewed in the aggregate, these amendments reflect an understanding by both Congress

and the Sentencing Commission that "an act of terrorism represents a particularly grave threat

because of the dangerousness of the crime and difficulty of deterring and rehabilitating the

criminal, and thus that *terrorists and their supporters should be incapacitated for a longer*

*period of time*."  United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003) (emphasis added).

### 1.  Application Note 1

Application Note 1 to § 3A1.4 states that the term "Federal Crime of Terrorism" is

defined at 18 U.S.C. § 2332b(g)(5); the term means an offense that "is calculated to influence or

affect the conduct of government by intimidation or coercion, or to retaliate against government

conduct" and is one of a series of specifically enumerated violations.  As discussed below, the

crimes of which the defendants stand convicted in this case were clearly calculated to influence

and affect the conduct of government by intimidation and coercion, as well as to retaliate against

government conduct.  In addition, both 18 U.S.C. § 2332a and 18 U.S.C. § 844(I) are enumerated

offenses.

### 2.  Application Note 3

Application Note 3 serves as an addendum to § 3A1.4's subsection (b) by clarifying that

the enhancement does not require a prerequisite criminal history Category VI for its application.

It provides for the automatic increase of criminal history to Category VI "in each such case."

The Second Circuit noted in Meskini that Congress and the Sentencing Commission had

a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4,

11

"because even *terrorists* with no prior criminal behavior are *unique among criminals* in the likelihood of *recidivism, the difficulty of rehabilitation,* and *the need for incapacitation.*" 319 F.3d at 91. (emphasis added).

## B. Each Count of Conviction Implicates a Specified Federal Statute that Supports the Terrorism Enhancement

Each count of conviction triggers the terrorism enhancement.  *See* 18 U.S.C. § 2332b(g)(5) and U.S.S.G. § 3A1.4.

### 1.   Count One: 18 U.S.C. § 2332a

Title 18, United States Code, Section 2332a is an enumerated offense within the definition of "federal crimes of terrorism" in 18 U.S.C. § 2332b(g)(5).  Therefore, the terrorism enhancement in U.S.S.G. § 3A1.4 applies, thereby increasing the offense level by 12 levels, and applying a criminal history category of VI to each of the defendants.

The statutory punishment for this offense as set forth in 18 U.S.C. § 2332a is as follows:

(A)  Maximum imprisonment: up to life;
(B)  Statutory fine: $250,000;
(C)  Maximum period of supervised release: 5 years; and
(D)  Special assessment: $ 100**.**

It is important to note that 18 U.S.C. § 2332a is a statute containing an express conspiracy and attempt provision.  It is comprised of two prongs, the first criminalizing conspiracies to victimize persons, and the second dealing with conspiracies to destroy or damage certain types and classes of property.

### 2.    Count Two: 18 U.S.C. § 2332a

Title 18, United States Code, Section 2332a is an enumerated offense within the definition of "federal crimes of terrorism" in 18 U.S.C. § 2332b(g)(5).  For the reasons discussed

12

above, the terrorism enhancement in U.S.S.G. § 3A1.4 also applies to this offense, thereby

increasing the offense level by 12 levels, and applying a criminal history category of VI to each

defendant. The statutory punishment for this offense is the same as that for Count One.

### 3. Count Three: 18 U.S.C. § 844(I)

Title 18, United States Code, Section 844(I) is an enumerated offense within the

definition of "federal crimes of terrorism" in 18 U.S.C. § 2332b(g)(5). For the reasons discussed

above, the terrorism enhancement in U.S.S.G. § 3A1.4 also applies to this offense, thereby

increasing the offense level by 12 levels, and applying a criminal history category of VI to each

defendant.

The statutory punishment for this offense as set forth in 18 U.S.C. § 2332a is as

follows:

(A) Maximum imprisonment: 20 years;
(B) Minimum imprisonment: 5 years;
(C) Statutory fine: $250,000;
(D) Maximum period of supervised release: 3 years; and
(E) Special assessment: $ 100.

### C. The Defendants' Conduct was Calculated to Influence or Affect the Conduct of the Government by Intimidation and Coercion and to Retaliate Against Government Conduct

The evidence before this Court leaves no question that the conduct of these three

defendants was "calculated to influence [and] affect the conduct of the government... [and] to

retaliate against government conduct." As such, the defendants' conduct involves a federal

crime of terrorism and the enhancement under U.S.S.G. § 3A1.4 should be applied.[3]

---

[3] The defendants concede that the counts of conviction meet the statutory predicates outlined in
18 U.S.C. § 2332b(g)(5)(B).

13

That evidence, when viewed in light of each individual defendant's actions and in light of the conspiracy as a whole, makes clear that the act of detonating the improvised explosive devices at the base of the Route 82 Bridge was meant to convey a message to the civilian population, the corporate word, the financial system, and all levels of government.  This was not an innocent "prank" conducted simply for the sake of fulfilling some juvenile fascination with explosives.  Rather, this was a carefully considered, planned, and executed "operation" to demonstrate anarchist support for a nationwide strike to be held on May 1, 2012 (the day after the attempted detonation of the explosives in this case) and as a prelude to a "civil war" that would commence at the joint G-8/NATO Summit scheduled to be held in Chicago in the middle of May.[4]

The evidence supporting the application of the terrorism enhancement to the defendants' conduct runs through the entire case.  Topically, it can be broken down into the following:

- Early Selection of Targets:  The Route 82 Bridge was but one of many locations proposed by the defendants (and not the CHS) as a target for violent action directed at government, corporate, and civilian populations.  Before the defendants discussed specific targets for the explosive devices, they also suggested, in rough chronological order, taking violent action against Cleveland police officers (during an anarchist riot), bank signs in downtown Cleveland, a

---

[4] The "Group of 8" Nations is comprised of the United States, United Kingdom, France, Italy, Germany, Japan, Canada, and Russia.  The annual summit between the heads of the G8 governments was scheduled to be held in Chicago on May 18-19, in advance of the NATO Summit to be held in Chicago on May 20-21.  The G8 Summit was moved to Camp David in light of security concerns related to expected protest activity.  The NATO Summit was held, as scheduled, in Chicago.

14

hospital, the Horseshoe Casino in Cleveland, the G-8 Summit in Chicago, and the Republican and Democratic National Conventions.

- Targeting a Bridge:  The original suggestion of targeting a bridge was made by Baxter to Wright and the CHS on March 28, 2012.  Specifically, while driving over the bridge at the interchange at I-480 and I-77 (the Valley View Bridge), Baxter asked "How much [explosives] do we need to take out a bridge?"  In reference to the Valley View Bridge, Wright stated "This would be a good one" and Baxter followed by saying "It would be!"  This inquiry by defendant Baxter was made immediately following a discussion by Wright, Baxter, and the CHS about the perceived start of a "civil war" in Chicago during the joint G-8/NATO Summit in mid-May. Both Wright and Baxter suggested "coordinating" their efforts with the anarchist element in Chicago; thus, the original plan to target a bridge had at its very core a tie to the expected violent, anarchist protest of the G-8/NATO Summit.  After a discussion about the placement of explosives on the columns of a bridge, Baxter stated "You know that... that if we… that this… if this is some… this happens they're gonna make security on almost every bridge in the entire [expletive] country."  Wright responded, "No, just the important ones.  But I mean, they got the Detroit Bridge, that would kill a bunch of people… that would kill a bunch of people."  Baxter then expressed concern that taking out the Detroit Bridge would be potentially problematic because "You don't wanna kill the people that [UI] like be on your side."  Wright then responded, "You don't want collateral damage."  These conversations make clear that both Wright and Baxter were supportive of the idea of disrupting commerce

through the targeting of major transportation arteries, that they had considered the possibility of casualties, and that they approved, by inference, of the consequent death of individuals who were not on their side.

- Purchase of Riot Gear:  On March 28, 2012, Wright and Baxter met with an Undercover Employee (UCE) of the FBI.  During this meeting, Wright and Baxter agreed to purchase five ballistic (i.e. bullet-resistant) vests, five retractable batons, ten canisters of tear gas, and five gas masks.  These items were purchased to be used in anarchist riot activities either in Cleveland or Chicago (during the G-8/NATO Summit) and would be used to engage law enforcement and other emergency responders.

- Anger at Cleveland City Hall:  On March 31, 2012, Baxter expressed frustration with obtaining a permit from the city of Cleveland for the planned "Heart Fest" to be held at the end of April.  Baxter proposed marching on Cleveland City Hall and telling them "we are not playing by your [expletive] rules… if you shut [Heart Fest] down, we will blow it wide open."

- Purchase of C4 Plastic Explosive:  On April 1, 2012, Wright negotiated the purchase of 8 blocks of C4 plastic explosive with the aforementioned UCE.  During the negotiation of the purchase, Wright and the UCE specifically discussed the use of C4 on a supporting column for a bridge.

- Federal Reserve Bank in Cleveland:  On April 1, 2012, following Wright's agreement to purchase the 8 blocks of C4 plastic explosive, the three defendants met with the CHS to discuss possible targets.  Wright stated that they could attach the explosives underneath an armored truck entering the Federal Reserve

16

Bank in downtown Cleveland.  Wright stated that this would "blow a big chunk of the [expletive] Federal Reserve."  Baxter stated, "Ok, wait, wait, wait, now we're talkin' a little bit like higher scale.  Let's just, let's see this, this is an open group discussion on this… on what we could be doin' right now."  Wright then stated, "I mean basically, that's what planning is. You gotta figure out what you're doing."  Baxter then raised the Fusion Center (see discussion below) and stated that "People have been attacking banks, and the Federal Reserve, for a long time, little progress."

- Northeast Ohio Fusion Center:  Also on April 1, immediately following the discussion of targeting the Federal Reserve, Baxter stated "So I don't think anyone has ever done anything to [expletive] with the Fusion Center."[5]  When asked where the Fusion Centers were located, Baxter stated that the largest one is in Ohio.  Stevens then asked, "You talkin' about the DHS Fusion Centers?"[6] After Baxter responded in the affirmative, Stevens then stated, "Hell yeah, man. That would be a great [expletive] target."  Baxter and Stevens then discussed a leaked report by the DHS related to the Occupy Movement and the role of Fusion Centers in "oppressing" the Occupy Movement.  Baxter and Stevens agreed that taking out the Fusion Center database would be difficult, but "monumental." Baxter stated that there may not be a time when nobody is working at the Fusion

---

[5] On March 28, 2012, Baxter observed a billboard for the Northeast Ohio Regional Fusion Center.  Baxter stated "I hate these things [Fusion Centers]."  Baxter then told Wright and the CHS that the Fusion Centers "came out shortly after the PATRIOT Act… and… they report to no one… They're a self-serving entity of the government."

[6] "DHS" is the United States Department of Homeland Security.

17

Center, but there might be less people there during the night.  Stevens then stated that the Northeast Ohio Fusion Center is located in Cleveland on the ninth floor of the Justice Center. [7]

- The Justice Center:  Also on April 1, in the midst of the discussion of targeting the Northeast Ohio Fusion Center, Wright stated to Stevens, "Hey, Connor, what was I talkin' about?  Takin' down the Justice Center… bringin' the Justice Center to the ground."  Wright then stated that he would wear a suicide vest filled with C4 plastic explosive into the Justice Center.  Baxter responded that "a long time ago, I was willing to do that… about a year ago, I was, I was really considering putting on a suicide vest."  Stevens then stated, "My thing is that if you can survive the attack, like another day, then why, why not?"

- Guantanamo Bay:  Throughout the course of the conspiracy, the defendants expressed concern that they would be placed in military custody at Guantanamo Bay Naval Base if they were caught. [8]  These conversations reveal the objectives of the defendants were purely to coerce, intimidate, and retaliate against the government – actions for which they expected to be treated as terrorists.  For instance, on April 10, 2012, Baxter stated that "if we get caught for this we are going to Guantanamo Bay."  Wright then agreed, "Yeah, we're not going to jail."  On April 18, 2012, Wright stated to the CHS that if they go caught, they would

---

[7] The Justice Center Complex is located in downtown Cleveland and houses the Cleveland Police Headquarters Building, the Cuyahoga County and Cleveland Municipal Courts Tower, and the Correction Center.

[8] Since late 2001, members of Al Qaeda and associated terrorist groups who have been designated as unlawful enemy combatants have been detained in military custody at Guantanamo Bay Naval Base.

18

go "directly to Guantanamo Bay… do not pass go, do not collect two hundred dollars."

- The Route 82 Bridge:  On April 18, 2012, Wright stated that he had identified a target in a "state park"; Wright confirmed that he had found this target on his own by using Google Maps.  Wright stated that they would obtain the explosives on April 27, which Wright stated was good because it still gave them four days before May 1st.  This target, later identified conclusively as the Route 82 Bridge, was targeted specifically due to its location, its position on a major road connecting to an interstate highway, and the high volume of passenger and commercial vehicular traffic.  The date of the actual attempted detonation of the devices is also critical.  As outlined above, the attack on the bridge was designed to coincide with the May 1st nationwide strike and the upcoming violent protest activity against the G-8/NATO Summit in Chicago.

- "Greatest Act of Terrorism":  On April 30, 2012, immediately after placing the improvised explosive devices at the base of the Route 82 Bridge, Stevens stated, in front of the other defendants, "We just committed the biggest act of, only act of terrorism, [UI] that I know in Cleveland since the 1960's."  Stevens then stated "The more I've been dealin' with [expletive] like this, the more I realize this like, Department of Homeland Security people, they've got their heads so far [expletive] up their [expletive]… it's so easy to run around them."

- Acknowledgment of Casualties:  Also on April 30, 2012, immediately after placing the improvised explosive devices at the base of the Route 82 Bridge, Baxter asked, "How are we gonna make sure there's no cars on the bridge when

it happens?"  Wright responded, "We can't."  Baxter then stated, "Okay."

Wright then stated, "All they gotta, if they notice the bridge shakin', they better

floor it, that's all I gotta say."  A few moments later, Stevens stated, "Ain't that

the [expletive] American dream, to get a [expletive] burger at Applebee's and

blowing up [expletive]."

Thus, the evidence that the defendants' conduct was calculated to influence, affect, and retaliate against government conduct is replete in the record. The defendants all concede that they placed improvised explosive devices at the base of the Route 82 Bridge with the intent to destroy or damage the structure.  They also concede to attempting to detonate those devices. They also concede to engaging in conversations, over the course of many weeks, about using explosive devices against government property. Finally, the defendants concede, as they must, that they made absolutely zero effort, whatsoever, to minimize civilian deaths and casualties, an omission that is all the more chilling given their demonstrated intent to bring down the Route 82 Bridge.

With respect to this Court's application of the terrorism enhancement, the factual question then is whether the defendants' criminal conduct during the months leading up to April 30, 2012 – and on that night itself – were "calculated to influence [and] affect the conduct of the government... [and] to retaliate against government conduct."  The very clear answer to this inquiry is resolutely yes.  The defendants' actions were calculated to influence and affect the conduct of the government.  The defendants' actions were further calculated to retaliate against government conduct.

The touchstone of the defendants' crime was not merely the planting and detonation of explosives.  Were this merely a "prank," as described by one defense attorney at an earlier

proceeding in this matter, then the target of the defendants' angst would not matter in the least bit.  If the defendants' objectives were simply the result of a juvenile desire to blow something up, or to inject some element of jest into the act, then they could have chosen any rock, tree, or outhouse as the object of this pursuit.  Yet that is not what occurred here.  The defendants' actions were guided, informed, and calculated at every step of the way by a singular purpose – to intimidate and coerce the civilian population and the government of the United States and to retaliate against that same government for a variety of perceived ills.  Accordingly, all of the criteria for the terrorism enhancement are met in this case.  The Court should thus adopt the PSRs on this issue and apply the enhancement under U.S.S.G. § 3A1.4 to each defendant.

<div style="margin-left: 50%;">

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney


By:     /s/ Duncan T. Brown
            Duncan T. Brown
            Justin E. Herdman
            Assistant U.S. Attorneys
            Reg. Nos. 3982931 (NY)/0080418
            400 United States Courthouse
            801 West Superior Avenue
            Cleveland, Ohio  44113
            Telephone Nos.:  (216) 622-3933/622-3965
            Facsimile No.:  (216) 685-2378
            E-Mail: duncan.brown@usdoj.gov
                   justin.herdman@usdoj.gov

</div>

21

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of November, 2012, a copy of the foregoing

Government's Memorandum of Law and Objections to the Final Presentence Reports was filed

electronically.  Notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


<u>/s/ Duncan T. Brown</u>
Duncan T. Brown
Assistant U.S. Attorney