IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:12CR238 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge David D. Dowd, Jr. |
| v. | ) | |
| | ) | |
| DOUGLAS L. WRIGHT, | ) | |
| BRANDON L. BAXTER, and | ) | GOVERNMENT'S |
| CONNOR C. STEVENS | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendants. | ) | |

Now comes the United States of America, by and through Steven M. Dettelbach, United States Attorney, and Duncan T. Brown and Justin E. Herdman, Assistant United States Attorneys, and files it sentencing memorandum.

## I.    OFFENSE LEVEL CALCULATION

### A.    The Base Offense Level Should be 28[1]

The Government asserts that the proposed Base Offense Level of 24 is incorrect and under represents the actual offense conduct.  Using §2K1.4 rather than §2M6.1 ignores the intent of the Guideline Commission to create an offense level for conduct affecting national security through the use of Weapons of Mass Destruction (WMD), not just the mere use of an explosive device without the ideological element.  Guideline §2M6.1 addresses crimes using WMDs, a term of art specifically defined in statute and the Sentencing Guidelines; in contrast, §2K1.4 merely addresses crimes where destruction of property is sought with no definition or distinction

---

[1] The Government recognizes that there is a paucity of case law on this issue – in its research, no cases were found where convicted defendants challenged the application of §2M6.1.

as to the device used.   Likewise, the Commentary to §2M6.1 clearly creates a distinction

between acts of terror – like using C-4 explosives to destroy government property – and acts of

violence using explosives – like using a pipe bomb to blow up the car of a rival crime family.

The confusion over the appropriate Guideline section stems from a cursory reading of the

two sections and the fact that both sections use the same statutory definition for destructive

device and explosive.  The devices were defined in the Indictment as "Weapons of Mass

Destruction," the definition provided in 18 U.S.C. §2332a(c)(2)(A) controls.  That definition

includes "destructive devices" as defined in 18 U.S.C.§921, which is identical to the definition

used in 26 U.S.C. §5845(f) and the same definition for "destructive devices" adopted by the

Sentencing Guidelines.  U.S.S.G. §1B1, Application Note 1.F, defines "destructive device"

consistent with its usage in the Indictment; likewise, §2K1.4 also uses 18 USC §921 to define

"explosive device."

The difference between the application of the two sections becomes apparent when the

Commentaries for the two sections are compared.  Although §2K1.4 uses similar language

concerning destruction and damage to government buildings, an examination of the commentary

to the application notes suggest that the language establishing a Base Offense Level 24 was

expanded to include a greater diversity of targets, not a greater diversity of destructive devices:

> Third, the amendment amends Appendix A (and the Statutory Provisions of the
> pertinent Chapter Two guidelines) to add three new offenses created by the
> Terrorist Bombings Convention Implementation Act of 2002, and provides
> conforming amendments within a number of Chapter Two guidelines to
> incorporate more fully the new offenses into the offense guidelines. Section 102
> of the Act created a new offense at 18 U.S.C. 2332f, which provides in subsection
> (a) that "whoever unlawfully delivers, places, discharges, or detonates an
> explosive or other lethal device in, into, or against a place of public use, a state or
> government facility, a public transportation system, or an infrastructure facility
> (1) with the intent to cause death or serious bodily injury, or (2) with the intent to
> cause extensive destruction of such a place, facility, or system, where such

destruction results in or is likely to result in major economic loss" and in subsection (b) that "whoever attempts or conspires to commit [such] an offense" shall be punished as provided under 18 U.S.C. 2332a(a). Section 2332a offenses currently are referenced to §§ 2K1.4 (Arson; Property Damage by Use of Explosives) and 2M6.1. The amendment refers this new offense to those guidelines as well. In addition, the amendment amends the alternative base offense levels in § 2K1.4(a)(1) so that the base offense level of level 24 applies to targets of 18 U.S.C. 2332f offenses, namely, state or government facilities, infrastructure facilities, public transportation systems and "places of public use".

Commentary to USSG § 2K1.4.

Clearly, if the Sentencing Commission intended §2K1.4 to replace §2M6.1, they would have expanded the definition of weapons to be used on those targets as well, instead, they opted to leave §2K1.4 as the guideline to be used with arson, racketeering-related bombings, and bombings that do not threaten national security.

Conversely, §2M6.1 remains the appropriate guideline to use for explosives used to threaten national security.  §2M6.1(a) applies a level of 42 for the use of a WMD against the United States and a level 28 for other applications of WMDs.  §2M6.1 is not limited to biological, chemical or nuclear weapons, as the defense argues, rather, those are specifically defined because, as is noted in the commentary, §2M6.1 was expanded to cover those weapons as they relate to violations of 18 USC 842(p)(2) in addition to "cases previously covered by the guideline (i.e. the acquisition of nuclear materials) **as well as to cases that implicate the national security and involve biological and chemical weapons and other weapons of mass destruction.**  (emphasis added).  Thus, §2M6.1 should be used in cases where WMDs are used to threaten national security and those WMDs can include, but are not limited to biological, chemical, nuclear or other weapons – and it is this "other weapons" catch-all that this case falls under.  Because §2M6.1 expanded its focus to include emerging WMDs it should not be shunted

aside when applied to traditional WMDs merely because it expands its definition of WMD to include those new forms of WMDs.

Recognizing that §2M6.1 focuses on both the intended target and the motive for attacking that target with a WMD, rather than solely on the device as §2K1.4 does, the Government asserts that it is the correct guideline to apply.  While the §2M6.1(a) level of 42 arguably applies, the government also recognizes that most cases involving similar facts to the instant case have applied §2M6.1(b), which assigns a level of 28.  Applying §2M6.1(b) is also consistent with the Commentary which recognizes that "[level 28] is expected to apply in most cases.

## II.     The Evidentiary Standard is a Preponderance of the Evidence

The appropriate standard employed in determining the factual basis for sentencing under the U.S.S.G. is a preponderance of the evidence.  United States v. Graham, 275 F.3d 490, 517 (6th Cir. 2001) (citing United States v. August, 984 F.2d 705, 714 (6th Cir. 1992).  More pointedly, a recent decision by the United States Court of Appeals for the Fourth Circuit soundly put to rest any heightened standard of proof with respect to the terrorism enhancement under U.S.S.G. § 3A1.4.  United States v. Chandia, 675 F.3d 329, 338-9 (4th Cir. 2012)("[A] preponderance of the evidence is the appropriate standard of proof for establishing the requisite intent for the terrorism enhancement.")


## The Elements in Applying the Terrorism Enhancement

The U.S.S.G. applies a victim-related enhancement where the offense is a felony that involved, or was intended to promote, a federal crime of terrorism.  U.S.S.G. § 3A1.4.  "There are only two elements that must be met in order for an offense to be a federal crime of terrorism, and neither of those elements requires an act to be violent." United States v. Assi, unpublished,

428 Fed.Appx. 570, 574 (6th Cir. June 30, 2011).  Those two elements are: (1) the offense must

be "calculated to influence or affect the conduct of government by intimidation or coercion, or to

retaliate against government conduct; and (2) be a violation of a list of enumerated statutes set

forth in 18 U.S.C. § 2332b(g)(5)(B). Id.

   Once the two elements required by 18 U.S.C. § 2332b(g)(5) have been met, there are no

additional requirements in order for the terrorism enhancement to apply. See, e.g., United States

v. Garey, 546 F.3d 1359, 1361-2 (11th Cir. 2008)(refusing to find a third element that the offense

transcend national boundaries)(citing United States v. Hale, 448 F.3d 971, 988 n. 1 (7th Cir.

2006); United States v. Nichols, 169 F.3d 1255, 1270 n. 3 (10th Cir. 1999)); see also Assi, supra,

428 Fed.Appx. at 574 (definition of "government" under U.S.S.G. § 3A1.4 is not limited to

government of the United States)(internal citations omitted).  In addition to the Garey case,

where the defendant was convicted of threatening to blow up a variety of retail outlets, city

buildings, and media organizations, the terrorism enhancement has been applied in a number of

cases that do not involve international terrorism.  United States v. Mason, unpublished, 410

Fed.Appx. 881, 886-7 (6th Cir. Dec. 15, 2010)(upholding application of terrorism enhancement

to arson conspiracy targeting university laboratory and commercial logging operations); United

States v. Harris, 434 F.3d 767, 772-4 (5th Cir. 2005)(upholding application of terrorism

enhancement to use of "Molotov cocktail" against municipal building); United States v. Schipke,

unpublished, 291 Fed.Appx. 107, 108 (9th Cir. Aug. 11, 2008)(upholding application of

terrorism enhancement to threatened use of weapon mass destruction against U.S. postal

facility); United States v. Tubbs, unpublished, 290 Fed.Appx. 66, 68 (9th Cir. Aug. 12,

2008)(upholding application of terrorism enhancement to arson of ranger station); United States

v. Christianson, 586 F.3d 532, 537-540 (7th Cir. 2009)(upholding application of terrorism

enhancement to destruction of U.S. Forest Service research projects); United States v. McDavid,

unpublished, 396 Fed.Appx. 365, 372 (9th Cir. Sep. 21, 2010)(upholding application of terrorism

enhancement to conspiracy to destroy federal research facility, fish hatchery, and cellular

telephone towers).

       As set forth in the plain language of the Guideline, the terrorism enhancement will also

apply in those situations where the offense of conviction does not itself involve a federal crime

of terrorism, but is instead "intended to promote" a federal crime of terrorism. Courts have thus

extended the application of the terrorism enhancement to those violations – most notably

conspiracies charged under 18 U.S.C. § 371, which is not an enumerated violation under 18

U.S.C. §2332b(g)(5)(B) – that are not inherently federal crimes of terrorism, but nonetheless

were offenses "intended to promote" a federal crime of terrorism.  In United States v. Graham,

supra, 275 F.3d 490 (6th Cir. 2006), the Sixth Circuit upheld the district court's application of

the terrorism enhancement based on the defendant's conviction under 18 U.S.C. § 371.  The

Sixth Circuit concluded that "the defendant need not have been convicted of a federal crime of

terrorism as defined in § 2332b(g)(5)(B) for the district court to find that he intended his

substantive offense of conviction or his relevant conduct to promote such a terrorism crime."  Id.,

at 517.  See also United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004)(upholding

application of terrorism enhancement where defendant conspired to destroy buildings affecting

interstate commerce by means of fire or explosive); United States v. Arnaout, 431 F.3d 994,

1001-02 (7th Cir. 2005)(upholding application of terrorism enhancement to convictions for

RICO).  As a result, "the terrorism enhancement does not hinge upon a defendant's ability to

carry out specific terrorist crimes or the degree of separation from their actual implementation.

Rather, it is the defendant's purpose that is relevant, and if that purpose to promote a terrorism crime, the enhancement is triggered."  Mandhai, at 1248.

### Co-Conspirator Liability for Terrorism Enhancement

During oral argument, the Court raised United States v. Stewart, 590 F.3d 93 (2nd Cir. 2009), as requiring "individualized" findings that the terrorism enhancement applies to each defendant.  At the outset, the government would note for the Court that in the Stewart case, the defendant to whom the terrorism enhancement was found inapplicable (defendant Yousry) was not found guilty of a conspiracy violation that was enumerated in 18 U.S.C. § 2332b(g)(5)(B). Instead, Yousry was convicted of a substantive violation of 18 U.S.C. §2339A, providing material support to terrorists, and a separate conspiracy under 18 U.S.C. § 371 for concealing the same offense.  CITE.  For reasons left unsaid, the government conceded that Yousry's first offense of conviction, a violation of 18 U.S.C. 2339A, did not involve a federal crime of terrorism and that Yousry's second offense of conviction, a violation of 18 U.S.C. § 371, was not "intended to promote" a federal crime of terrorism.  Thus, the Second Circuit had no basis on which to evaluate Yousry's co-conspirator liability under the framework of U.S.S.G. § 3A1.4; as a result, Stewart provides less guidance for this Court than might otherwise appear.

Pursuant to the Sentencing Guidelines and well-established principles of conspirator liability, a conspirator is deemed responsible for the acts of his or her co-conspirators, if those acts were foreseeable and in furtherance of the conspiracy:

> Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) *adjustments in Chapter Three,* shall be determined on the basis of the following:

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) *in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,*

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense....

U.S.S.G. § 1B1.3(a) (emphasis added). For a defendant to be held accountable for the conduct of others through jointly undertaken criminal activity, "(1) the conduct must be in furtherance of the jointly undertaken criminal activity; and (2) the conduct must be reasonably foreseeable in connection with that criminal activity." United States v. Campbell, 279 F.3d 392, 399 (6th Cir. 2002) (citing U.S.S.G. § 1B1.3, cmt. n. 2).

Similarly, § 3A1.4 does not require that the defendant commit a "federal crime of terrorism" in order for the enhancement to apply. Thus, pursuant to § 1B1.3(a), the terrorism enhancement applies if a co-conspirator committed a federal crime of terrorism during the course of the conspiracy and the offense was reasonably foreseeable and in furtherance of the joint criminal activity undertaken by the defendant. See Graham, 275 F.3d at 516-17 ("This interpretation of the phrase 'intended to promote' is in harmony with the fact that, pursuant to U.S.S.G. § 1B1.3, a defendant's base offense level may be adjusted for acts which the defendant did not necessarily commit but were committed by others in furtherance of a jointly undertaken criminal activity with the defendant and were reasonably foreseeable to the defendant in connection with that activity.").

In Campbell, 279 F.3d at 400, the Sixth Circuit held that § 1B1.3(a)(1)(B) "requires that the district court make *particularized* findings with respect to both the scope of the defendant's agreement *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy."  In following the Second Circuit's interpretation of § 1B1.3(a)(1)(B) in United States v. Studley, 47 F.3d 569 (2d Cir.1995), the Campbell court noted that the first prong of the Studley test "serves to differentiate between co-conspirators' varying degrees of culpability. In order to determine the scope of the defendant's agreement, the district court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."

Therefore, at each defendant's sentencing, "the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." United States v. Whitecotton, 142 F.3d 1194, 1197 (9th Cir.1998).  Upon that determination, the Court will then decide whether one or more co-conspirators committed a federal crime of terrorism that was reasonably foreseeable and in furtherance of that defendant's particular agreement. If so, the court may rely on the actions of co-conspirators in applying the terrorism enhancement.

**Application of the Terrorism Enhancement Does Not Require that a Defendant Target Government Property**

That the defendants in this case ultimately chose a target servicing primarily civilian vehicular traffic does not negate the application of the terrorism enhancement where, as here, the defendants' conduct was calculated to influence or affect the government and to retaliate against government conduct.  The U.S.S.G. provides a separate, distinct, enhancement where the victim is a government official.  U.S.S.G. § 3A1.2; see also In re Terrorist Bombings of U.S. Embassies

in East Africa, 552 F.3d 93, 152-5 (2nd Cir. 2008)(discussion of separately applying government victim, hate crime, and terrorism enhancements).  Were the terrorism enhancement to require a finding that the actual target of the defendants' violent action was government property, then § 3A1.4 would not apply to infamous terrorist acts such as the September 11th attack on the World Trade Center, the Christmas Day 2009 attempted bombing of a Northwest Airlines flight over Detroit, and the attempted vehicular bombing of Times Square in 2010.  Yet § 3A1.4 carries no such requirement for obvious reasons – the purpose of the conduct is what counts, not the target itself.

With respect to that purpose, there is no requirement that it carry any persuasive effect or even whether it was well-founded.  As the Seventh Circuit explained in upholding the application of the terrorism enhancement against defendants convicted of destroying forestry research experiments:

> "Here, the purpose behind defendants' actions was to further [the Earth Liberation Front's] political agenda: to end industrial society.  The method they chose to communicate this desire was not a peaceful protest with speeches, songs, and a petition outside the facility but instead a violent attack against the facility and the experiments… Indeed, it doesn't matter why the defendants oppose capitalism and the United States government – if they use violence and intimidation to further their views, they are terrorists."

Christianson, supra, 586 F.3d at 532.  Therefore, even where a defendant's purpose is confused or insufficiently articulated, the terrorism enhancement should apply where violence and intimidation have been used to further that view.

### The Defendants' Conduct was Calculated to Influence or Affect the Conduct of Government and to Retaliate Against Government Conduct

The evidence presented to this Court from the outset of this case leaves no question that the conduct of these three defendants, individually and collectively, was "calculated to influence [and] affect the conduct of the government... [and] to retaliate against government conduct."  As

such, the defendants' conduct involves a federal crime of terrorism and the enhancement under U.S.S.G. § 3A1.4 should be applied.[2]

**<u>Douglas Wright</u>**

As the leader of the conspiracy, defendant Wright made clear from the beginning that he was intent on engaging in violent activity against the government, namely law enforcement.  The eventual targeting of the Route 82 Bridge was merely an outgrowth of his avowed hatred for law enforcement and the corporate-political convergence forming the "1-percent".  The following facts are just some of those in the record demonstrating that Wright's conduct in conspiring and attempting to bomb the Route 82 Bridge was calculated to affect, influence, and retaliate against the conduct of government.

- <u>Interest in Explosives</u>:  As illustrated through the testimony of co-conspirator Anthony Hayne, defendant Wright had an early interest not only in obtaining explosives, but in employing them against structures.  (Transcript of Sentencing Hearing, 11/5/2012, PageID 2454-7).  This interest in explosives did not extend to smoke bombs, which Wright viewed derisively.  (Id., PageID 2457).  Most notably, this desire to obtain explosives predated Wright's relationship with the CHS and occurred near the same time that the CHS reported Wright was frustrated with the "Occupy Cleveland" movement's focus on peaceful protests.  (Id., PageID 2290-1).  As discussed below, each defendant shared Wright's frustration with the "Occupy Cleveland" movement's non-violent approach.
- <u>"Black Block"</u>: Early on in the recorded conversations with the CHS, Wright demonstrated an interest in preparing for the employment of a "black block" at the G8/NATO Summit to be held in Chicago during May 2012.  Wright stated that a "black block" is a "group of people that basically beat the [expletive] outta the cops and keep the non-violent protestors from getting' beat the [expletive] up by cops."  (Government Exhibit 1, at 3).  Even months later, after placing the explosives at the base of the Route 82 Bridge on April 30, Wright was eager to get to Chicago as soon as possible, where he expected the black block would be "huge." (Government Exhibit 7, at 12-13). These

---

[2] The defendants concede that the counts of conviction meet the statutory predicates outlined in 18 U.S.C. § 2332b(g)(5)(B).

statements demonstrate that from the very beginning, Wright – who obviously considered himself a "violent protestor" – was determined to engage in violent conduct that would affect, influence, and retaliate against government conduct, namely police officers.

- Purchase of Riot Gear:  In line with these early expressions of violent, anti-government beliefs, Wright negotiated the purchase of five bulletproof vests, five collapsible batons, and ten tear gas canisters.  (Government Exhibit 2, at 12-13).  With respect to the vests, Wright indicated that he was interested in learning whether it would provide protection against a "Beretta… or a… like some kinda…some kinda nine mil[limiter]."  (Government Exhibit 2, at 3-4).[3]  More importantly, Wright was insistent on purchasing "retractable" batons which could be concealed.  (Government Exhibit 2, at 5).  Wright indicated that these retractable batons would be used at "close range" and would be "hidden."  (Government Exhibit 2, at 8).  These statements indicate that Wright's intent was to engage in violent protest activity, specifically against law enforcement, that would necessarily be offensive nature – otherwise there would be no need for collapsible batons and tear gas canisters, let alone bulletproof vests.

- "Civil War" in Chicago:  Wright also indicated that he believed there was "a good chance… a very good chance… almost a sure thing" that a civil war would begin during the Chicago protests.  (Government Exhibit 1, at 6).  Wright explained that "it's almost a sure thing that it's gonna wake people up, 'cause it's gonna be thousands upon thousands of people there."  (Id.).  These Chicago protests, which were scheduled to coincide with the G8/NATO Summit in mid-May, would occur after a nationwide general strike scheduled to occur on May Day, May 1st.  (Id., at 5-6).  Not coincidentally, the attempted bombing of the Route 82 Bridge in this case occurred on the night of April 30.  Notably, Wright was specifically aware of the importance of May 1 and expressed an interest in obtaining the explosives in advance of that date. (Government Exhibit 6, at 4).  On the very night of the attempted bombing of the Route 82 Bridge, Wright was the first to suggest leaving for Chicago immediately.  (Government Exhibit 7, at 12).  This belief that a "civil war" would begin in Chicago – when coupled with the ultimate targeting of the Route 82 Bridge on the night before a nationwide general strike was expected to begin – clearly show that Wright's purpose in engaging in violent activity was to affect, influence, and retaliate against government conduct.  This fact is all the more important when viewed in light of his eagerness to get to Chicago, where a large international government summit would soon take place, immediately after placing the explosive at the base of the Route 82 Bridge.

- Starting "Small" and Building Up "Bigger":  The eventual targeting of the Route 82 Bridge was fully in line with Wright's plan to "start smaller [expletive] and build up bigger."  (Government Exhibit 1, at 5).  This was a goal that was shared by defendant

---

[3] The 9mm caliber handgun is the predominant variant in use by law enforcement agencies in the United States.  The Beretta M9 (also a 9mm caliber handgun) is the standard issue sidearm to the United States and NATO military members.

Stevens, among others, who described the April 30 attempted bombing of the bridge as a "nice learning experience" by first, "building a tight-knit group," and second, "testing" the bomb.  (Government Exhibit 7, at 17).  Wright agreed and suggested finding an "engineer" to assist in future bombings.  (Id.).   These conversations indicate that the Route 82 Bridge bombing was but the first step in a veritable campaign to affect, influence, and retaliate against government conduct.

- <u>Targeting the Federal Reserve</u>:  As discussed below with respect to defendant Baxter, the defendants did discuss targets that were government property, but ultimately elected to choose the Route 82 Bridge for a variety of reasons, not least among them the decreased amount of scrutiny and security at that site.  Wright himself suggested placing explosives under an armored car entering the Federal Reserve, thereby "blowing a big chunk" out of the facility.  (Government Exhibit 4, at 8).  The fact that the Federal Reserve was not ultimately selected as a target does not absolve these defendants, and especially not Wright, of the application of the terrorism enhancement.  Rather, this suggestion – and his discussions with his co-conspirators of other government targets – illustrates that the purpose of the conspiracy to bomb, and attempted bombing of, the Route 82 Bridge was calculated from the outset to affect, influence, and retaliate against government conduct.[4]

- <u>Guantanamo Bay:</u>  Wright did state on at least two occasions that if caught, he expected to go to Guantanamo Bay.  (Government Exhibit 5, at 18; Government Exhibit 6, at 6).  The importance of these statements is that Wright did not consider himself to be a common vandal engaged in a prank, but to be a terrorist who would be detained at Guantanamo Bay along with others engaged in a war against the United States fueled by a violent ideology.

### Brandon Baxter

Of all the defendants, Baxter most clearly articulated the objectives of the conspiracy following his arrest.  Yet even before he made those statements, the purpose of Baxter's violent conduct was clear – his actions leading up the night of April 30, as well as the violent operation attempted that evening, were all calculated to affect, influence, and retaliate against government conduct.  The following facts constitute a fraction of those in the record demonstrating the purpose of Baxter's conduct.

---

[4] Wright also indicated that he had conversations outside the presence of the CHS regarding government targets, including an apparent discussion with defendant Stevens about "bringing the Justice Center to the ground." (Government Exhibit 4, at 12).  This target was ultimately not selected because, as suggested by the CHS, this target contained inmates.  Defendant Stevens then stated in response, "Right, right, we'd be killin' a lot of our own people."  (Id.).

- Interest in Explosives:  Anthony Hayne's testimony also indicated that Baxter was interested in obtaining explosives at an early date, in November 2011. (Transcript of Sentencing Hearing, 11/5/2012, PageID 2456-7).  This conversation occurred well before Baxter's relationship with the CHS and could not be the product of anything other than an independent, personal desire to engage in violent activity.

- Frustration with the "Occupy Cleveland" Movement:  Baxter was affiliated with the Occupy Cleveland movement in the fall of 2011.  As he described during his testimony to this Court, the Occupy Cleveland movement was a "peaceful" movement engaged in non-violent protest of banks, the financial system (including the Federal Reserve), the role of money in the U.S. political system, and the U.S. military's involvement in wars overseas.  (Transcript of Sentencing Hearing, 11/6/2012, PageID 2520-22).  Baxter shared the objectives of the Occupy Cleveland movement, but was frustrated by the lack of success obtained through non-violent protest.  (Id., PageID 2522-25).  As he stated to FBI Special Agent Daniel Molina following his arrest, "I've been working with Occupy [Cleveland], and it's like I can't even get them to do anything that would upset people… disrupt traffic or do anything illegal."  (Government Exhibit 12, at 14).  When Baxter eventually chose to bomb the Route 82 Bridge, this action was a direct outgrowth of his disappointment with the lack of success met by Occupy Cleveland's non-violent protests.  Thus, his violent actions were clearly calculated to affect, influence, and retaliate against government conduct.

- "Black Block":  Similar to his co-defendant Wright, Baxter was eager to join with the "black block" at the G8/NATO Summit to be held in Chicago during May 2012.  Baxter explained: "Ya, the point of black block is to… um… protect… protect the protestors from the police.  Um… whether that means that… um… whether we get in their faces and then run and take them somewhere else and then go… go raise hell somewhere else, or whether that means we actually combat them in some manner…" (Government Exhibit 1, at 5).  Baxter was also aware of Wright's intention to go to Chicago immediately after the IEDs were placed at the foot of the Route 82 Bridge. (Government Exhibit 7, at 12).  These statements demonstrate that Baxter and his co-conspirators linked violent activity to protest against the conduct of the U.S. government and its allies.  Those beliefs necessarily drove Baxter, as well as his co-conspirators, to conduct the attack on the Route 82 Bridge to coincide temporally, for maximum effect, with the May 1st nationwide strike and the upcoming G8/NATO Summit in Chicago.

- Purchase of Riot Gear:  Similar to Wright, Baxter was involved in the negotiations to purchase five bulletproof vests, five collapsible batons, and ten tear gas canisters. (Government Exhibit 2, at 12-13).  Baxter was equally insistent on purchasing "collapsible" batons, not larger billy clubs that could not be concealed.  (Government Exhibit 2, at 12).  Again, these statements indicate Baxter's intent was to engage in violent protest activity, specifically against law enforcement, that would not be defensive or protective, and certainly not peaceful protest.  This fact is important when assessing

the ultimate motive for Baxter's involvement in the conspiracy to bomb the Route 82 Bridge.

- "Civil War" in Chicago:  Baxter also indicated that he believed there was "quite a possibility" that a civil war would begin during the Chicago protests.  (Government Exhibit 1, at 6).  When considered in light of Baxter's expressed desire to engage in violent protest in Chicago, let alone his agreement to purchase collapsible batons and tear gas for that event,  the fact that Baxter expected the Chicago protests to spark a "civil war" is all the more demonstrative of his purpose in attempting to bomb the Route 82 Bridge.

- Targeting the Federal Reserve:  As discussed above, Baxter was present with Wright when the Federal Reserve was proposed as a target.  At the time, Baxter offered a negative assessment of the Federal Reserve as a target.  Clearly, though, this was not based on any sense of compassion, but on a cold-hearted analysis that "[p]eople have been attacking banks, and the Federal Reserve, for a long time, little progress." (Government Exhibit 4, at 9).  This statement demonstrates that Baxter had no objection to engaging in "attacks," but wanted the violent activity to result in some "progress."

- Targeting the Fusion Center:  Baxter explicitly suggested that the defendants target the Northeast Ohio Fusion Center, located in the Justice Center in Cleveland, Ohio.  In previous conversations, Baxter had expressed his hatred of the Fusion Center and demonstrated knowledge that it was a government facility.  (Government Exhibit 1, at 7).  Baxter stated that taking out the Fusion Center database would be "really [expletive] difficult, but monumental." (Government Exhibit 4, at 11).  After the CHS asked how they would prevent casualties, Baxter expressed relative indifference: "If there is not a period where there is no one working there, um, probably during the night, there's probably less people workin' there." (Id.).  As with Wright's suggestion of the Federal Reserve as a target, Baxter's discussion of the Fusion Center is evidence that the purpose of the conspiracy to bomb, and attempted bombing of, the Route 82 Bridge was calculated from the outset to affect, influence, and retaliate against government conduct.

- Guantanamo Bay:  As with Wright, Baxter stated that if caught, he expected to go to Guantanamo Bay.  (Government Exhibit 5, at 18).  Again, the importance of this statement is not its veracity, but what it says about the motives of Baxter and his co-defendants.

- Baxter's Description of His Motive:  During his post-arrest interview, Baxter was asked the following by Special Agent Molina: "What's your background that got you involved in… trying to do, like, economic damage?" (Government Exhibit 12, at 10). Baxter eventually responded that "our politicians and most every aspect of our society are controlled by… large corporate empire… and they pay police off to get away with things and pay for politicians' campaigns and get their own people on regulation agencies and in our departments so that they do almost anything." (Id., at 10-11).  Baxter expressed further disgust that the United States is "under the rule of these, these large corporations"

and "bombing all these different countries all over the place… it's all for money, it's all for money."  (Id., at 11).  Baxter then stated that he "just wanted to stop the flow of money to some of these large corporations, slow it down a little bit."  (Id.).  Special Agent Molina then asked Baxter, "Was there someone in particular that got you involved in kinda wanting to uh, change things through… a violent act like this… or did you just see this purely as a acceptable form of protest?"  (Id., at 12).  Baxter replied: "I don't see it as a protest.  Protesting is when you tell an institution you're upset with them… This was, um, this was an action… this, institutions don't listen."  (Id.).  These statements crystallize the purpose of Baxter's violent action – he was engaged in violent action, as opposed to protest, because institutions "don't listen."  Those institutions include the U.S. government and, as a result, Baxter's criminal conduct clearly was calculated to affect, influence, and retaliate against government conduct.

**Connor Stevens**

Of all the defendants, Stevens was perhaps the least talkative in the months leading up to the night of April 30.  His comments following the placement of the explosives at the Route 82 Bridge, though, are perhaps the most enthusiastic and, without a doubt, the clearest manifestation that the defendants were engaged in terrorist activity.  Defense counsel for Stevens has tried to include a requirement that, in order for the terrorism enhancement to apply, there must be some evidence of the defendant's motivation that precedes the actual violent act.  Yet no such requirement is explicitly stated within the plain text of U.S.S.G. § 3A1.4, nor can one even be inferred.  No matter the timing of the evidence indicating Stevens' purpose on the night of April 30 – and there is evidence before that date – the fact remains that Stevens baldly stated on the night of April 30 the following: "[W]e just committed the biggest act of, only act of terrorism, that I know in Cleveland since the 1960's."  (Government Exhibit 7, at 6).  There is no better evidence which could constitute a window into the mind of defendant Stevens – as well as the rest of his co-defendants, none of whom corrected him – about the calculation behind the Route 82 Bridge bombing.  In addition, the following facts help to show that Stevens' conduct was calculated to affect, influence, and retaliate against the conduct of government.

- <u>Interest in Explosives</u>:  Anthony Hayne's testimony also indicated that Stevens was interested in obtaining explosives in November 2011. (Transcript of Sentencing Hearing, 11/5/2012, PageID 2456-7).  This conversation occurred before Stevens' relationship with the CHS and could not be the product of anything other than an independent, personal desire to engage in violent activity.

- <u>"Black Block"</u>: Stevens also indicated a familiarity with the concept of a "black block" and described his participation in a Los Angeles riot as "awesome."  (Government Exhibit 7, at 13).  Stevens also engaged in the conversation with Wright about travelling to Chicago on May 1, 2012 following the detonation of the IEDs at the Route 82 Bridge. (Id., at 7).

- <u>Targeting the Fusion Center</u>:  After co-defendant Baxter suggested targeting the Northeast Ohio Fusion Center with explosives, Stevens expressed knowledge that the Fusion Centers were affiliated with the U.S. Department of Homeland Security and stated "Hell ya man, that would be a great [expletive] target." (Government Exhibit 4, at 11).  Much like the discussion above related to his co-conspirator's discussion of government facilities as targets, Stevens' enthusiasm is evidence that the purpose of the conspiracy to bomb, and attempted bombing of, the Route 82 Bridge was calculated from the outset to affect, influence, and retaliate against government conduct.  Moreover, Stevens and Wright had independently discussed targeting the Justice Center as a target, but decided not to ultimately pursue this target because it would risk making casualties of the inmates, described by Stevens as "our people."  (Id., at 12).

- <u>Route 82 Bridge Bombing as a "Nice Learning Experience"</u>:  As early as April 7, 2012, Stevens expressed a desire to engage in continuing violent action, as opposed to a one-off attack.  When Baxter and Wright discussed targeting the Justice Center with a suicide vest, Stevens indicated that he would be against this plan to "survive the attack, like another day."  (Government Exhibit 4, at 11).  This objective continued through to April 30, when Stevens stated that "for a half-ass plan, that worked out pretty well." (Government Exhibit 7, at 10).  Stevens further stated that any reluctance he demonstrated was merely a result of the continually changing nature of the plan.  (Id.).  Stevens described the April 30 bombing plan as a "nice learning experience" as it resulted in "building a tight-knit group" and "testing" the operation.  (Government Exhibit 7, at 17).  This demonstrated desire to engage in further destruction is clearly evidence that Stevens' conduct was calculated to affect, influence, and retaliate against government conduct.

- <u>History of Anti-Government Activity</u>:  As set forth in Government Exhibits 8-10, Stevens has exhibited a history of supporting violent action against the government, including the United States military.  Dating back to his high school years, Stevens engaged in a pattern of frightening activity by directing explicit violent threats against military recruiters and law enforcement officers, all under the guise of the "Fighters for Freedom" and the "United Student Front."  (Government Exhibit 10).  These same activities were

referenced in Stevens' autobiography, titled "The Education of An Anarchist," which was published on a public website after he was arrested in this case.  (Exhibit 8).  This writing, which is replete with Stevens' expressions of "hate" for police officers, the military, and U.S. foreign policy, makes clear that Stevens has been "combatting imperialism" from an early age.  (Id., at 2).  Perhaps most disconcerting, Stevens' advocacy for violent action has not ceased following his detention in this case.  Rather, he has continued to call for "love that can only be expressed in action" and "all the power to the people, in arms" in a letter published on a public website.  (Government Exhibit 9).  Again, these statements by the defendant make clear the purpose of his violent activities in this case – they were actions calculated to affect, influence, and retaliate against government conduct.

## III.  <u>ROLE IN THE OFFENSE</u>

As an even cursory review of the documents submitted by the Government shows, there are different levels of participation by each defendant.  The Government concedes that Defendants Hayne and Stafford were late arrivals to the conspiracy and, as such, should not suffer increased penalties for their roles.  However, Defendants Wright, Baxter and Stevens were participants from the early stages, and each took a material role in bringing the conspiracy to completion.  Moreover, based on defense arguments to date, the Government asserts any attempts to mitigate role based on an argument that the CHS overwhelmed their ability to resist his suggestions is not only contrary to their pleas in Court, but also directly at odds with their purported acceptance of responsibility.[5]

---

[5]The defense of entrapment and does not expand it to the theory of "vicarious" or "indirect" entrapment which has been expressly and repeatedly rejected by the Sixth Circuit as a viable theory of defense or at sentencing.  <u>United States v. Mendez-Ortiz</u>, 810 F.2d 76 (6th Cir. 1986); <u>United States v. McLernon</u>, 746 F.2d 1098 (6th Cir. 1984); <u>United States v. Lee</u>, 694 F.2d 649 (6th Cir. 1983).

### Douglas Wright

The Government submits that Wright should be assessed an additional four (4) levels pursuant to U.S.S.G. §3B1.1(a) for being the organizer and leader of the criminal activity with five or more participants.  The five participants were Wright, Baxter, Stevens, Stafford, and Hayne.  Throughout the recordings, Wright takes charge of the group.  This leadership role was supported by sworn testimony provided on November 5th and 6th by Hayne and Baxter in open court.  Each co-defendant identified Wright as the person who recruited them to join and as the driving force of the group.  Additionally, Hayne identified Wright as the architect of the initial plan and the person who reached out to him to buy and use explosives in November, 2011, and again in April, 2012.  Wright also openly recruited several other individuals who eventually dropped out.  Wright conducted research into bridges and selected the final target; he and Stevens also reconnoitered the selected location.  At all times, Wright was an eager and active member and leader of the group.

Additionally, Wright has a long history of arrests and convictions for violent behavior and spoke openly and often of his desire that the bombing would be used by other anarchist groups to start a "civil war" that would lead to the overthrow of the government.  From the initial meetings with the CHS, Wright had a plan that was detailed, specific, and had an intended message animating it; this was not a mere "prank" in his mind, his was a message to the world and the first step in a violent anarchist ideology.  He recruited every member of the group personally and made sure each was committed to the same end goal he was.

### Brandon Baxter

The Government argues that Baxter should be assessed an additional three (3) levels pursuant to U.S.S.G. §3B1.1(b) for being a manager, but not leader, of the criminal activity with

five or more participants.  Baxter spearheaded many discussions of targets, and in fact, kept the group focused on governmental targets and targets that carried political significance and meaning.  Baxter was present at the initial meeting with the undercover agent to discuss purchasing explosives and tactical gear, and also at the actual purchase and delivery of the IEDs. Moreover, he repeatedly mentioned his hatred of Department of Homeland Security Fusion Centers, the desire to target the Federal Reserve, and his willingness to hinder commerce. Finally, Baxter was the first person to suggest a bridge as the target and was also the first to offer to serve as a decoy during protests to confuse and obstruct law enforcement's response to any explosions.

Although Pre-trial Services declined to give him an enhanced role, such an increase is appropriate and warranted.   U.S.S.G. §3B1.1 provides for an increase if the behavior was consistent with action in the past; Baxter assaulted his step-father with a knife, has an open case for Carrying a Concealed Weapon, and admitted to being a Neo-Nazi.  His behavior in this case is consistent with the violent and politically motivated actions of his past - it is important to consider that this crime of violence has a political motivation behind it and that Baxter has similarly self-identified himself with violent, racist groups as well.

Most importantly, while on the stand, Baxter admitted that he was motivated to stop the flow of money and that his actions arose from his being "anti-government and anti-authoritarian."  Clearly he was a motivating force within the group and aided in its ideological direction.

### Connor Stevens

The Government contends that Stevens should be assessed an additional two (2) levels pursuant to U.S.S.G. §3B1.1(c) for being an active participant and organizer of the criminal

activity with five or more participants.  Regardless of his mindset during the day of the bombing, when the car left for the bridge, he was in it based on his own free will and volition.  This is consistent with his prior activity with the group; Stevens was present at multiple meetings between February and the time of arrest, he was an active participant in the strategy and planning sessions.  Stevens offered ideas for governmental targets and also added assistance in the reconnoitering of the selected target.  At no time did Stevens try to stop the conspiracy and, in fact, as evidenced in 1D33 made on the night of the attempted bombing, was eager to introduce a structural engineer into the group for the next anticipated in order to assure maximum damage.  Stevens was noticeably excited the night of the bombing, and indicated he was glad he participated in, and took pride in being part of, what he believed to be "greatest act of terrorism in Cleveland since the 60's."  Clearly, he saw this as an act of terrorism and wanted to do more with his self-described "family" because he thought they would "get away with more because DHS has its head up it's a--."

As with Baxter, Stevens has a history of politically motivated crime.  While a high school student he organized a protest of the United States Army that included emailing threats of violence against Army recruiters, a posting on a social media website accessible to the public encouraging people to "KILL COPS!  YEA, THE PIGS IN BLUE ARE THE FASCISTS WE HAVE TO FIGHT!!!!  LET'S FUCK 'EM UP, LET'S ORGANIZE!!!  Kill a cop!  In struggle, Connor C. Stevens," and attempting to form a group called the "United Student Front" to further those goals.  Writing of that group in July of this year, he reflected that he thought at that time the National Guard would engage them in battle.  Quite simply, Stevens' behavior and actions during this conspiracy were lock-step in line with his prior actions of trying to incite people to violently attack the government in the hopes of causing a military reaction.  Moreover, his prior

actions demonstrate that he was in agreement with the political aims that this attempted bombing was done to further.

## IV.   THE ACCEPTANCE OF RESPONSIBILITY ADJUSTMENT SHOULD NOT BE GIVEN

Prior to discussing why the two-level reduction for acceptance of responsibility awarded by the Court is not appropriate, the Government reasserts that it is not extending its level to Defendants Wright, Baxter or Stevens.

The Government argues that currently, only Defendant Baxter has affirmatively provided testimony that negates his acceptance of responsibility.  However, going forward, based on arguments intimated by counsel for Wright and Stevens, the Government encourages this Court to revisit this subject if arguments continue to advance a theory of sentencing entrapment or vicarious, or "indirect," entrapment.  Such variations of the entrapment defense have been consistently rejected by this Circuit and should be thusly rejected by this Court.  United States v. Mendez-Ortiz, 810 F.2d 76 (6th Cir. 1986); United States v. McLernon, 746 F.2d 1098 (6th Cir. 1984); United States v. Lee, 694 F.2d 649 (6th Cir. 1983).  Indirect entrapment is essentially the argument that, but for the CHS' influence, the defendants would have never taken the steps they ultimately did.  This theory belies two very important pieces of evidence in this case.  First, and most importantly, the defendants not only pled guilty to the entire indictment, but that indictment contained conspiracy charges which expanded the scope for what they must accept responsibility to include the actions of all co-conspirators.  Second, co-defendant Anthony Hayne testified that Defendants Wright, Baxter, and Stevens all attempted to acquire explosives from him outside the presence of, and without the knowledge of, the CHS, thus their claims that the CHS prodded them to act in an unfamiliar manner is patently untrue.

**<u>Brandon Baxter</u>**

His actions and testimony are directly at odds with the plain language definition of acceptance set forth in U.S.S.G. §3E1.1. On November 6, 2012, Defendant Baxter took the stand and attempted to blame his role in the conspiracy entirely on the CHS, claiming that he was overcome by promises made by the CHS and thus unable to make any decisions on his own. This testimony should not be rewarded with any decrease in offense level for acceptance because it is inconsistent with his plea of guilt. Defendant Baxter, during questioning by the Court, on page 299 of the transcript (PageID 2558) stated that the CHS manipulated him to the point of his not knowing what he was doing or why he was doing it, mirroring his earlier claims that he was blinded by the CHS' lavish promises. However, this assertion is wholly inconsistent with his testimony that he ignored repeated calls from the CHS for weeks prior to the bombing and he had effectively severed ties with the CHS. Despite his claims of being so overborne by the CHS, Baxter testified that he had broken free of the CHS, secured a much better paying job than that offered by the CHS, lived independently of the CHS, and was even able to secure drugs and alcohol without the help of the CHS.

Conversely, in the same line of questioning he admitted that he was anti-government and the intent of the bombing was to stop the flow of money, thus he identified personal and ideological reasons independent of the CHS' promises that drew him to participating in the bombing. At no time in his testimony, or in any of his filings, did he assert that the CHS introduced the motive for the bombing. As is demonstrated by Baxter and reinforced by the recordings, the motive was offered by Wright, Baxter and Stevens, the CHS was never the ideological mastermind. Therefore, Baxter's testimony offers the following logical paradox: if his November 6th testimony of being overwhelmed is be credited then he is arguing entrapment,

thus negating his acceptance of responsibility, or if his testimony is not credited, then he is minimizing his freely stated ideological reasons for participating in the bombing by making up contradictory and fabulist stories to shift the blame to the CHS and he should be denied acceptance of responsibility for failing to comply with the requirements of the Sentencing Guidelines' definition of acceptance.  In either scenario, Defendant Baxter should not receive a two level reduction for acceptance of responsibility.

### Defendants Wright and Stevens

As stated above, with regard to the first point; traditional co-conspirator liability certainly requires that all individual co-conspirators are liable for the actions of the conspiratorial group as a whole; likewise, the individual co-conspirator must accept responsibility for the actions of the group consistently and completely in order to receive the benefit of a reduction in sentence in recognition of their acceptance of responsibility.

In the instant case, the defendants Wright and Stevens seemingly want to argue that they were both naïve enough to be overcome by the cult of the CHS' personality and be rendered unable to rebuff his entreaties, while at the same time being apparently savvy enough to refute every suggestion of violent behavior, recognize implausible plots for their failings, and aware enough to provide alternatives to the CHS' advances that would both minimize harm and send a non-political message which would not be interpreted as a sign of terrorism.  Such a dichotomy is not only absurd, it stretches the limits of intellectual honesty to attempt to fashion a scenario where both goals are balanced.  And certainly, in anticipation of the competing claims of youthful indiscretion on one hand, coupled with misguided expressions of thoughtful and contemplative young minds deserving of extraordinary and unparalleled leniency on the other, such competing claims cannot co-exist in this case.

The fundamental problem with accepting responsibility, and then attempting to argue that the CHS overwhelmed them, is that the recordings demonstrate that all of the defendants engaged in multiple conversations concerning targets, roles in the plots, strategies, deployment of the bombs, and even critiques of the various plans.  The CHS offered no plans, did not force the reconsideration of any targets, nor did the CHS criticize any proposed target.  He simply was a listening post who at times asked only for the group's consensus.

By their pleas of guilt, it is evident that none of the defendants were entrapped, thus, the defendants must likewise accept the fact that as co-conspirators they must be responsible for the escalation of the plot by their fellow brothers-in-arms.  Although only the CHS and Wright were present at every meeting, it was Wright, not the CHS who formed the group, introduced the plans, suggested explosives for the plans, and championed the ideological cause.  The CHS' constant presence was simply because the CHS was tasked with maintaining contact with the group for the purposes of a law enforcement investigation.  The defense now wants to suggest that the CHS' constant presence be afforded meaning that is not supported by evidence and thereby ignores the group's common disenchantment with Occupy Cleveland, hatred of the government, and shared anarchist background independent of the CHS.  Simply put, the fact that the CHS played any role whatsoever must be credited with the fact the defendants used the CHS for rides around town, access to the internet, and occasional employment.[6]  The CHS was merely a means to an end for the defendants in their already decided upon goal to carry out an attack that would, in their minds, lead to a larger civil war.

---

[6]WRIGHT and STEVENS worked with a roofing contractor during this time, BAXTER had outside employment, and the work provided by the CHS was not permanent.

This is reinforced by both the early reporting of the CHS and the testimony of Anthony Hayne.  The CHS repeatedly reported of Defendant Wright's plans as early as November, 2011, to carry out a plan where smoke bombs created diversions while bank signs were released from their moorings atop Cleveland skyscrapers.  This plan, while not explicitly requiring the use of explosives, did demonstrate Defendant Wright's desire to send a message to the government by attacking businesses and government targets[7] while also creating the risk of substantial bodily injury or death.  Wright had identified multiple potential members for this action, including both Baxter and Stevens, as well as others who ultimately did not join.  Likewise, the recordings demonstrate that both Baxter and Stevens identified potential members who possessed specialized skills or who they believed were disposed to violent acts.

Contemporaneously, Wright, Baxter and Stevens approached Hayne in November, 2011, about buying explosives for them.  This is a clear and unequivocal indication that regardless of the CHS, who they had not incorporated in their plans at that time, the group was committed to buying or acquiring explosives.  This is reinforced by the conversations on 1D4 and 1D6 where Wright talks to the CHS about making plastic explosives because they are otherwise too expensive to purchase; indeed, Wright acquired The Anarchists' Cookbook in order to learn how to make plastic explosives out of household items.  Thus, for any defendant to suggest that they were not aware of the intent of the group, or that the CHS led them to discuss topics they had never considered without him is completely incredulous and creates the situation where either their acceptance of responsibility for the conspiracy is invalid, or their arguments must be

---

[7] Although much will be argued trying to cleave the government from businesses, it cannot be contested that the defendants and their fellow anarchists see the government and business as two heads of the same beast and that, with the exception of within this case, the two are inseparable and one-and-the-same.

dismissed for trying to forward indirect entrapment arguments rejected by the Sixth Circuit and thus runs afoul of §3E1.1's definition of acceptance of responsibility.

Respectfully submitted,
STEVEN M. DETTELBACH
United States Attorney

By:      /s/ Duncan T. Brown
Duncan T. Brown
Justin E. Herdman
Assistant U.S. Attorneys
Reg.No.3982931(NY)/0080418(OH)
400 United States Courthouse
801 West Superior Avenue
Cleveland, Ohio  44113
Telephone Nos.:  (216) 622-3933/3965
Facsimile No.:  (216) 685-2378
E-Mail:  duncan.brown@usdoj.gov
justin.herdman@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 9th day of November, 2012, a copy of the foregoing

Government's Sentencing Memorandum was filed electronically.  Notice of this filing will be

sent by operation of the Court's electronic filing system to all parties indicated on the electronic

filing receipt.  Parties may access this filing through the Court's system.

 /s/ Duncan T. Brown
Duncan T. Brown
Assistant U.S. Attorney